**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MARIA ORDONEZ,<br><br>        Plaintiff,<br><br>vs.<br><br>GREEN TREE SERVICING LLC,<br><br>        Defendant. | 2:14-cv-01284-RCJ-CWH<br><br>**ORDER** |

This case arises out of the alleged breach of a mortgage modification agreement and subsequent communications related to an alleged default. Pending before the Court are two Motions for Summary Judgment (ECF Nos. 66, 67).

**I.   FACTS AND PROCEDURAL HISTORY**

Plaintiff Maria Ordonez allegedly defaulted on her home mortgage sometime prior to July 2013. (Am. Compl. ¶¶ 18–19, ECF No. 8). Defendant Green Tree Servicing LLC obtained the mortgage from the prior beneficiary after Plaintiff's alleged default. (*Id.* ¶ 20). In or about July 2013, Plaintiff entered into a trial modification agreement (the "TMA") with Defendant, making three trial-period payments from July to September 2013. (*Id.* ¶ 22). In September 2013, Defendant offered Plaintiff a permanent modification agreement (the "PMA"), with payments to begin October 1, 2013, which payments Plaintiff made. (*Id.* ¶¶ 24–27). Nevertheless, Plaintiff

continued to receive billing statements from Defendant indicating that she was thousands of dollars in arrears, culminating with a debt collection letter seeking $22,505.52 by January 1, 2014. (*Id.* ¶¶ 28, 32).  When Plaintiff contacted the representative identified on Defendant's letters, Shannon G., Shannon told Plaintiff there was an error in Defendant's system and that Plaintiff was current under the PMA. (*Id.* ¶¶ 33–35).  Plaintiff then withheld payment, as instructed by Shannon G. (*Id.* ¶¶ 36–37).[1]  Defendant continued to send collection letters to Plaintiff, including a May 17, 2014 letter indicating that Plaintiff's mortgage had been referred to foreclosure and that she did not qualify for a modification, which had, according to the letter, been denied on May 1, 2014. (*Id.* ¶ 39).

Plaintiff sued Defendant in this Court.  The Amended Complaint ("AC") lists claims for: (1) Fair Debt Collection Practices Act ("FDCPA") violations; (2) Nevada Deceptive Trade Practices Act ("NDTPA") violations; (3) Breach of the Implied Covenant of Good Faith and Fair Dealing; (4) Declaratory Judgment; (5) Waiver and Estoppel; and (6) Breach of Contract.  The FDCPA claims are brought under 15 U.S.C. § 1692e(10) and § 1692f(1).  The NDTPA claims are brought under Nevada Revised Statutes section ("NRS") 598.0915(15) and 598.0923(3).  The Court notes that the fifth claim for "waiver and estoppel" is not a separate cause of action.  Defendant has moved for defensive summary judgment, and Plaintiff has moved for offensive summary judgment on the FDCPA claims.

**II.   SUMMARY JUDGMENT STANDARDS**

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson*

---

[1] It is unclear whether Plaintiff means to allege that she withheld payment only as to the alleged arrears or even as to the PMA.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme. The moving party must first satisfy its initial burden. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.

If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid

summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That is, even if the underlying claim contains a reasonableness test, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

**III. ANALYSIS**

Defendant admits it entered into the PMA with Plaintiff but explains that after it did so it noticed that the forborne principal amount (and, accordingly, the total principal amount) of the PMA was too large by approximately $12,000.[2]  Plaintiff refused to execute a corrected modification, even though it was more favorable to her by nearly $12,000.  Moreover, she ceased making payments under the PMA altogether.

///

---

[2] The forbearance is the portion of principal upon which interest does not accrue and which need only be paid at the maturity date of the loan.

### A.   DECLARATORY JUDGMENT

In the AC, Plaintiff asks the Court to declare that the PMA is binding on the parties. Plaintiff has not asked for summary judgment on this claim, but Defendant has requested summary judgment against it. Plaintiff does not seek a declaration that Defendant breached the PMA but only that the PMA is binding. The Court denies summary judgment to Defendant as against the claim for a declaration that the PMA remains binding.

Defendant appears to admit the parties entered into the PMA, and it attaches a copy to its motion. (*See* PMA, ECF No. 67-33 to 67-34). The PMA has a "Modification Effective Date" of October 1, 2013. (*Id.* ¶ 3). The PMA provides for a term of 36 years, a principal balance of $279,938.47, an interest rate of 4.5% as to $194,503.31 of the principal, and a forbearance of the remaining $85,435.16 of the principal until the maturity date. (*Id.* ¶ 3.A–3.C).[3] Fixed monthly payments of principal and interest under the PMA are $910.87, (*id.* 3 tbl.), which is less than half of the lowest possible monthly payments under the original adjustable-rate loan.[4] Plaintiff and Defendant signed the PMA on September 23 and 27, 2013, respectively. (*See id.*, ECF No. 67-34, at 3). At that point, the PMA was binding on the parties.

The PMA also provides, however:

> That I will execute such other document as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; (ii) *correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error.* If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect; such terms will not be modified

---

[3] Plaintiff's original 30-year $257,212 loan had an interest rate of 8.5%, adjustable annually to between 8.5% and 15.5%. (*See* Deed of Trust 2, ECF No. 67-4, at 7; Adjustable Rate Rider 3, ECF No. 67-7, at 6).

[4] Monthly payments of principal and interest for a $257,212 loan amortized over 30 years are $1,978 at an 8.5% interest rate.

>by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification Program.

(*Id.* ¶ K (emphasis added)).  Defendant sent Plaintiff a Corrected Modification Agreement (the "CPMA") in early January 2014. (Plaszcz Decl. ¶ 19, ECF No. 67-30, at 2).  The terms of the CPMA were identical to the terms of the PMA, with the same monthly payments, except that the CPMA reduced the total principal balance to $268,268.86 by reducing the amount of principal in forbearance to $73,765.58. (*Id.* ¶ 16; CPMA ¶ 3.B–3.C, ECF No. 67-32, at 7).  The CPMA was therefore more favorable to Plaintiff, because the only difference was that $11,669.58 less would be due when the loan matured in 2049. (Plaszcz Decl. ¶ 20).  Plaintiff testified that she could not recall whether she ever received the CPMA. (Ordonez Dep. 81).  Whether or not Defendant has a potential equitable claim against Plaintiff to enjoin her to execute the CPMA, there is at a minimum a question of fact whether the PMA remains binding, and the Court therefore denies summary judgment to Defendant on that question.

### B.     CONTRACTUAL CLAIMS

The Court also denies summary judgment to Defendant as to the breach of contract claim.  Although it appears Plaintiff failed to perform under the PMA by failing to make payments thereunder since November 2013, (*see* Plaszcz Decl. ¶ 23; Ordonez Dep. 31–32, ECF No. 67-2), there is conflicting evidence as to whether Defendant informed Plaintiff's husband to stop making payments, and Plaintiff's counsel at the hearing represented that Plaintiff had continuously "self-escrowed" the defaulted amount for tender if necessary to do equity, which is a strong indication of good faith.  The claim for breach of the implied covenant of good faith and fair dealing survives, as well.

///

///

**C.     FDCPA**

**1.     The Merits**

Defendant first argues it is not a "debt collector" under 15 U.S.C. § 1692(a)(6). FDCPA's definition of a "debt collector" does not refer to "loan servicers" or "mortgage services" in particular but includes "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). A mortgage servicer has the principle purpose of collecting debts, i.e., mortgage payments, and it regularly collects debts owed to another, i.e., the loan beneficiary. The Court therefore finds that a third-party mortgage servicer such as Defendant falls under the general definition of "debt collector" given in § 1692a(6).

There is an exception under § 1692a(6)(F) as to, *inter alia*, "a debt which was not in default at the time it was obtained by such person." *Id.* § 1692a(6)(F)(iii). The text of the statute implies that the date of default should be compared to the date the beneficiary obtained the debt, not to the date the servicer obtained the right to service the debt. The full exception reads in relevant part:

> The term ["debt collector"] does not include . . . any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default at the time it was obtained by such person . . . .

*Id.* § 1692a(6), (6)(F). The statute is concerned with the default status "at the time it was obtained by such person." "[I]t" must refer to "debt," not servicing rights, because "debt" is the only noun in subsection (6)(F)(iii) to which the immediately following clause beginning with "which" can apply. "[S]uch person" must therefore refer to "another" in subsection (6)(F), i.e.,

the beneficiary, not "any person," i.e., the collector, because subsection (6)(F)(iii) is concerned with "the time it [the debt] was obtained by such person," and it is not the collector but the beneficiary who "obtains" a debt. Although grammatically, "such person" more naturally refers back to "any person," it can also refer to "another," and this interpretation better alleviates the tension of the alternative, which would require interpreting "it" to refer to "the right to service or collect a debt" as opposed to "a debt," where only the latter phrase is present in the statute for reference.

Some district courts in this Circuit have ruled, however, that a loan servicer is outside of subsection (6)(F)(iii)'s exclusion if it obtained the servicing rights after default, regardless of whether the beneficiary itself obtained the debt after default. *See, e.g.*, *Natividad v. Wells Fargo Bank, N.A.*, No. 3:12-cv-3646, 2013 WL 2299601, at *4 (N.D. Cal. May 24, 2013) (citing *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985)). As the Court of Appeals has noted (in a case decided on a different basis), the Senate Report on the FDCPA indicates an intent to make the date the debt collector obtains the right to collect the debt the critical one. *See De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011) (citing S. Rep. No. 95–382 (1977)). The cited report indicates:

> Finally, the committee does not intend the definition to cover the activities of trust departments, escrow companies, or other bona fide fiduciaries; the collection of debts, such as mortgages and student loans, by persons who originated such loans; *mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default **when taken for servicing***; and the collection of debts owed to a creditor when the collector is holding the receivable account as collateral for commercial credit extended to the creditor.

S. Rep. No. 95–382, at 3–4 (1977) (emphases added). Although the statute could have been better worded to more clearly reflect the intent stated in the report, the report clarifies Congress's intent as to the ambiguous referent of "it" in the phrase "it was obtained" under

§ 1692a(6)(F)(iii). *See, e.g.*, *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006) (citing *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1045 (9th Cir. 2005)) ("If the statute's terms are ambiguous, we may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent."). This interpretation also resolves the tension of interpreting "such person" to refer to "another" as opposed to "any person," where the latter phrase is a more natural fit.

In summary, the Court finds that Defendant was a debt collector. Defendant obtained the servicing rights from Bank of America on March 16, 2013. (Bank of Am. Letter, ECF No. 66-5). Plaintiff attests that the loan was in default before that date. (Ordonez Decl. ¶ 9, ECF No. 66-3).

Next, Defendant notes that Plaintiff admitted at her deposition that her mortgage debt had been discharged in bankruptcy on January 25, 2013. (*See* Ordonez Depo. 41–43; Bankr. Sched. D in Case No. 07-bk-17386, ECF No. 67-11, at 7 (listing $253,516 in secured mortgage debt to Countrywide Home Loans and indicating an intent to surrender the property); Ch. 7 Statement of Intention, ECF No. 67-15, at 4 (indicating an intent to surrender the property); Discharge Order, ECF No. 67-15, at 9). Defendant notes that a bankruptcy discharge extinguishes personal liability on the underlying debt but does not invalidate creditors' liens going forward. *See, e.g.*, *Johnson v. Home State Bank*, 501 U.S. 78, 82–83 (1991). In other words, a mortgagee cannot sue on the underlying debt after a Chapter 7 discharge, but it can foreclose on the property if the debt is not voluntarily paid. Defendant notes that some courts, including at least one court of appeals, have ruled that post-discharge attempts to negotiate in lieu of foreclosure do not implicate the FDCPA because there is no personal obligation to repay such debts. *See, e.g.*, *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 23–24 (1st Cir. 2002).

In *Arruda*, the plaintiff alleged only that the mortgagee had offered to permit her to retain the collateral in exchange for money. *See id.* at 23. That was not an attempt to collect a "debt" because it was not an attempt to collect "any obligation or alleged obligation of a consumer to pay money." *Id.* (quoting 15 U.S.C. § 1692a(5)). The defendant was not alleged to have held any actual or alleged debt obligation, and the mere mention of a discharged debt was not a claim by the defendant that there was any obligation to pay; the lien-holder had simply offered not to repossess the property in exchange for money:

> Let us be perfectly clear. We recognize that a plaintiff may bring a claim under the FDCPA by pleading that a debt collector falsely alleged an obligation to pay money. But the complaint in this case fails to state a claim under that theory. The complaint never asserts that the lawyers told the Kowals that they were obligated to pay money on account of the discharged debts or otherwise, nor does it allege facts sufficient to support an inference that the lawyers acted so as to create this false impression. Indeed, the collection letters (attached to the complaint) conclusively refute any such illation.
>
> Those letters presented the Kowals with the terms under which Sears was willing to abandon its right of repossession, no more and no less. The letters indicated the amount of money that "Sears believe[d] ... represent[ed] the fair market value of the items," and stated that if the Kowals did "not agree with these values, [they had] the option of reopening the bankruptcy and seeking a valuation hearing." Given this correspondence, the most that can be said is that the Kowals faced an unhappy choice in these transactions, not an obligation to pay money.

*Id.* at 23–24 (alterations in original).

Plaintiff here alleges that Defendant sent her letters indicating that she owed money and would face foreclosure if she did not pay it. Although the case law seems clear that Defendant could have foreclosed regardless of the discharge of Plaintiff's personal obligation to repay the underlying debt, Defendant was not immune under the FDCPA for any attempts to actually collect the discharged debt. Plaintiff adduces three letters from Defendant as evidence of attempts to collect the debt. The first two letters are "Monthly Informational Statements" respectively indicating that $17,938.98 was due by December 1, 2013 and that $22,505.52 was

due on January 1, 2014. (*See* Letters, ECF Nos. 66-10 to 66-11).  The third letter is a business letter dated April 24, 2014 indicating a response to a "qualified written request" and a verification of the debt as being based on the previous adjustable-rate note. (*See* Letter, ECF No. 66-12).  The Court finds that this evidence is not sufficient to show that Defendant was collecting "debt" when it sent these informational letters.  The Court of Appeals has adopted the Seventh Circuit's rule that letters not demanding payment but only listing amounts due and prospective due dates are not attempts to collect debt under the meaning of the FDCPA even if accompanied by a warning that failure to pay will result in default. *See De Dios*, 641 F.3d at 1075 (citing *Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384 (7th Cir. 1998)).  The Court grants summary judgment against the FDCPA claim.

    **2.**    **Standing**

Defendant next argues Plaintiff has no Article III standing because she has no evidence of damages.  Defendant concedes that it should lose on this issue under *Robins v. Spokeo, Inc.*, 742 F.3d 409 (9th Cir. 2014) but wishes to preserve the issue pending the Supreme Court's ruling on certiorari as to whether Congress can grant Article III standing based purely on the violation of a federal statute.  The Supreme Court has ruled, but the issue is moot since the FDCPA claim fails for other reasons, so the Court will not perform a *Robins* analysis.

    **D.**    **NDTPA**

The Court grants summary judgment against this claim because NDTPA does not apply to real property transactions, except perhaps as to misrepresentations in purchase contracts, which is not alleged here. *See, e.g.*, *Bonvicin v. Bank of Am. Corp.*, No. 2:14-cv-1279, 2016 WL 632211, at *3 (D. Nev. Feb. 17, 2016) (Navarro, C.J.) (collecting cases).

///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 66) is DENIED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 67) is GRANTED IN PART and DENIED IN PART.  The Court grants summary judgment to Defendant on the FDCPA claim and the NDTPA claim, but otherwise denies the motion.

IT IS SO ORDERED.

Dated this 7th day of July, 2016.

_____
ROBERT C. JONES
United States District Judge